**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION**

| | |
|---|---|
| PINE ISLAND PROPERTY HOLDINGS, LLC and PINE ISLAND GC, LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> BEAUFORT COUNTY, SOUTH CAROLINA, <br><br> Defendant, | Civil Action No.: 9:26-cv-1617-RMG _____ <br><br> **COMPLAINT** <br><br> (*Jury Trial Demanded*) |

COME NOW Plaintiffs Pine Island Property Holdings, LLC and Pine Island GC, LLC ("Plaintiffs"), by and through their undersigned counsel, and submit this Complaint against Defendant Beaufort County, South Carolina, which includes a ***facial challenge*** to the Cultural Protection Overlay, as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff Pine Island Property Holdings, LLC ("PIPH") is a South Carolina limited liability company. PIPH owns real property located in Beaufort County, South Carolina burdened by an unconstitutional and vague ordinance imposed and enforced by the County.

2.      Plaintiff Pine Island GC, LLC ("PIGC") is a South Carolina limited liability company doing business in Beaufort County. PIGC is affiliated with PIPH and assists with the management, planning and development of PIPH's property and specifically with the intended plan of development of the property as a golf course with a limited number of

residences.  When a golf course is constructed, PIGC would be the operating company of the golf course and related facilities.

3.      This action relates to approximately five hundred and two (502) acres of land owned by PIPH located on a portion of St. Helena Island, Beaufort County, South Carolina, known as "Pine Island" and is properly identified by TMS Nos.: R300-007-000-0002-0000 and R300-012-000-0256-0000 (the "Property").

4.      Defendant Beaufort County, South Carolina (the "County") is a governmental entity and municipal corporation existing under the laws of the State of South Carolina and operating in Beaufort County, South Carolina.

5.      This action is brought pursuant to 42 U.S.C. § 1983.

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction) because this case arises under the United States Constitution and seeks equitable and other relief for the deprivation of constitutional rights under color of state law.

7.      This Court is authorized to damages under applicable statutes and common law as well as awarding attorneys' fees and costs under 42 U.S.C. § 1988(b).

8.      Venue is proper in the United States District Court for the District of South Carolina, Beaufort Division pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' causes of action occurred in Beaufort County, South Carolina.

9.      Plaintiffs seek a judgment and declaration that Ordinance 2023/18 is facially unconstitutional and an injunction prohibiting its enforcement, along with relief in the form of damages and other relief set forth herein.

## **FACTUAL ALLEGATIONS**

10.      The County adopted Ordinance 2023/18, which codifies the current version of the Cultural Protection Overlay ("CPO"), on May 8, 2023 and continues to enforce and maintain this race-based zoning ordinance in a selective, arbitrary and unlawful manner. The County has acted and continues to act under color of state law in adopting and enforcing the CPO allegedly pursuant to S.C. Code § 6-29-720 and other applicable state zoning statutes, even the CPO itself violates state law.

11.      Plaintiffs' constitutional injury arises from the text, structure, and mandatory operation of the ordinance on all property upon which the CPO is imposed, and is not contingent upon the approval, denial, or withdrawal of any particular development application.

12.      Plaintiffs have an injury in fact, as the owner and intended operator of a business on 502 acres upon which the County has imposed the CPO.  The CPO deprives Plaintiffs of an economic use of their land that is affirmatively permitted by the underlying base zoning, the Rural (T2R) Zone.

13.      The injury is traceable to and flows directly from Beaufort County's enactment and continued enforcement of Ordinance 2023/18. The County has not repealed, amended, or suspended the ordinance, such that this facial challenge to the ordinance is presently justiciable.

14.     The injury is redressable.  A declaration that the ordinance is facially unconstitutional and an injunction against enforcement would immediately restore Plaintiffs' right to develop a golf course as a by-right use under T2R. Also damages under 42 U.S.C. § 1983 and other counts in the Complaint would compensate for past economic harm.

15.     Both forms of relief are within the authority of the Court and the jury. Effectual relief through declaratory judgment, injunction, and damages is fully available.

16.     There is no remaining mechanism for Plaintiffs to obtain relief through administrative processes alone.

17.     Plaintiffs face a realistic, continuing and non-speculative threat of enforcement. The ordinance is not dormant. Any application to develop a golf course would be denied on the basis of the CPO. The County has repeatedly done so over three years.

18.     There are collateral consequences arising from the County's enforcement of race-based zoning policies.

19.     Plaintiffs are directly burdened by Ordinance 2023/18 by virtue of owning property within the CPO district and being subject to its facial restrictions. The constitutional injury to Plaintiffs is not contingent upon approval or denial of any particular development application, but flows directly from the ordinance's text, purpose, and mandatory operation on all property within its geographic boundaries.

20.     The County has enacted and is enforcing a race-conscious zoning scheme, which explicitly prohibits otherwise productive land uses for the stated purpose of preservation of the Gullah/Geechee people, a specific racial and ethnic group identified

in the text of the CPO as "descendants of enslaved people brought from West Africa and indigenous Americans from the Sea Islands." See CDC § 3.4.50, entitled "Cultural Protection Overlay (CPO) Zone Standards," attached as Exhibit A.

21.     The CPO imposes categorical land use prohibitions in an arbitrary manner, banning golf courses, resorts, and gated communities, on 7,286 parcels covering approximately 64 square miles of St. Helena Island. These prohibitions do not apply uniformly throughout Beaufort County; they apply only within the CPO boundaries, which the County claims to be geographically coterminous with the identified Gullah/Geechee community.  This premise is false, as there are thousands of property owners burdened by the CPO who are not members of the Gullah Geechee community and there are thousands of members of the Gullah Geechee community who do not reside within the arbitrary boundaries of the CPO.

22.     The County already possesses race-neutral zoning tools, such as the Rural Zone (T2R) base zone, to protect rural character. However, the CPO was layered on top of the T2R base zone for an expressly race-conscious purpose.

23.     PIPH owns approximately 502 acres on St. Helena Island that is zoned T2R, under which golf courses are a use that is "Permitted By Right." See CDC § 3.1.60.

24.     It is the CPO that turns permitted uses into prohibited ones for the alleged purpose of protecting and favoring members of one racial class at the inherent over others.  A constitutional injury to Plaintiffs flows directly from the ordinance's text and mandatory operation, as opposed to generating from any particular development application.

25.     Plaintiffs have incurred millions of dollars in expenses attempting to resolve the unlawful application of the CPO and exhausting administrative remedies.

26.     Plaintiffs have submitted multiple applications over a three-year period, each representing a distinct procedural pathway to achieve the same underlying, lawful development objective. The County has repeatedly denied these independent development applications.  Each denial was based on arbitrary enforcement of the CPO rather than deficiencies in the underlying development concept. These denials and associated regulatory processes have been administered through a documented pattern of procedural departures, misrepresentations, and predetermined outcomes.

27.     Plaintiffs brought a lawsuit to challenge the constitutionality of the CPO, on its face and as applied to Plaintiffs, and the County's enforcement of the CPO against Plaintiffs, and claims for damages under 42 U.S.C. § 1983, in the matter captioned Pine Island Property Holdings, LLC and Pine Island GC, LLC v. Beaufort County, South Carolina, Civil Action No. 9:23-cv-03962-RMG (the "Prior Action").

28.     The Prior Action was unilaterally dismissed on mootness grounds by Order entered February 20, 2026 [ECF No. 86] by the Honorable Richard M. Gergel on a sua sponte basis.  It is undisputed that Plaintiffs were not provided with notice or opportunity to be heard prior to Judge Gergel's dismissal of the case independent of motion.

29.     In the dismissal Order, this Court found that Plaintiffs' Amended Complaint in the Prior Action alleged an "as applied" challenge to the CPO that was focused on obtaining approval of specific development applications, as opposed to a facial challenge to the CPO. See ECF No. 86 (9:23-cv-03962-RMG).  **This action brings a facial challenge.**

30.     This Court did not reach the merits of Plaintiffs' claims in the Prior Action because the entire action was dismissed sua sponte on mootness grounds.  As a result, none of Plaintiffs' claims have been heard on the merits.

31.     After Judge Gergel's surprise ruling, Plaintiffs filed a motion for reconsideration and requested a hearing, which was denied two business days after it was filed and without a response from the County. See ECF Nos. 88 and 89 (9:23-cv-03962-RMG).

32.     The Court concluded that "Plaintiffs were seeking an advisory opinion related to the withdrawn plans." See ECF 89 (9:23-cv-03962-RMG).

33.     As Judge Gergel's mootness ruling was based on a specific factual posture as alleged in the Amended Complaint in the Prior Action (ECF 45 (9:23-cv-03962-RMG)), this action cures the perceived defects by alleging a present, live controversy arising from the same CPO for which Plaintiffs have suffered and continue to suffer ongoing injury, as well as new injuries as a result of the County's conduct that occurred subsequent to the filing of the Prior Action, as further alleged herein.

34.     In denying reconsideration, Judge Gergel found that the "gravamen" of the prior action was that Plaintiffs alleged vested rights in a prior plan that sought approval of three six-hole golf courses, as opposed to a single, 18-hole golf course.   **In this action, Plaintiffs do not seek any relief relating to a plan to build three six-hole golf courses.**

35.     In this action, Plaintiffs seek a declaration that the CPO is unconstitutional on its face and as applied to Plaintiffs' and the Property, and damages and available relief

for ongoing injuries that Plaintiffs have suffered, and will continue to suffer, because of the CPO, which remains in effect.

36.     The dispute remains live and ongoing. The Ordinance is still in effect and continues to be imposed. Every day the CPO remains in effect, it imposes categorical land use restrictions for race-based purposes and in a manner that is unlawful, vague, and continues to damage Plaintiffs.

37.     In this action, Plaintiffs seek relief and remedies based on the following causes of action: (i) Violation of the Equal Protection Clause of the Fourteenth Amendment (Facial Challenge – 42 U.S.C. § 1983); (ii) Violation of the Equal Protection Clause of the Fourteenth Amendment (As Applied - 42 U.S.C. § 1983); (iii) Violation of the Fourteenth Amendment – Void for Vagueness (Facial and As-Applied Challenge – 42 U.S.C. § 1983); (iv) Violation of the Fourteenth Amendment – Procedural Due Process (42 U.S.C. § 1983); (v) Violation of the Fourteenth Amendment – Substantive Due Process (42 U.S.C. § 1983); (vi) Violation of the Equal Protection Clause of the Fourteenth Amendment (Class-of-One – 42 U.S.C. § 1983); (vii) Violation of the Dormant Commerce Clause (U.S. Const. art. I, § 8 – 42 U.S.C. § 1983); (viii) Declaratory and Injunctive Relief (28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 65); and (ix) Invalidity Under South Carolina Law (Ultra Vires / Violation of S.C. Code § 6-29-720).[1]

38.     On May 8, 2023, Beaufort County adopted Ordinance 2023/18, which amended the terms of the zoning restrictions being imposed through Beaufort County Community Development Code ("CDC") § 3.4.50. See Ordinance No. 2023/18, attached as Exhibit B.  Upon enactment, Ordinances 2023/18 became the current form of the CPO.

---

[1] This action does not seek relief relating to any withdrawn plans.

39.     Ordinance No. 2023/18 reflects the legislative history, purpose, scope, boundaries, and text of the CPO.

40.     The CPO's purpose statement expressly identifies a specific racial and ethnic group as the basis for its land use restrictions:

> St. Helena Island is home to one of the largest Gullah/Geechee communities on the southeast coast. **The Gullah/Geechee people are descendants of enslaved people brought from West Africa and indigenous Americans from the Sea Islands.**

See CDC § 3.4.50(A) (emphasis added).

41.     For the purpose of protecting a specific racial classification, the CPO prohibits certain types of site design, stating that "[d]esign features that restrict access to water and other culturally significant locations, and franchise design, are prohibited." See CDC § 3.4.50(C). These prohibitions lack definition and criteria.

42.     As a result of these and other deficiencies, the CPO is void for vagueness.

43.     The Ordinance expressly links its land use prohibitions, and the County's policy, to the presence and preservation of a racial group:

> Based upon the Purpose statement above, and in particular the National Park Service's Low Country Gullah Culture: Special Resource Study & Final Environmental Impact Statement, Beaufort County finds that golf courses, resorts, fences, beachfront development, boat landings, marinas, and the coastal population explosion are all encroaching upon and in some cases overtaking Gullah/Geechee Culture, it is the public policy of Beaufort County to protect St. Helena Island's rural, historic, and cultural heritage by prohibiting the following uses which are deemed to be incompatible with the Cultural Protection Overlay District.

See CDC § 3.4.50(D).

44.     In addition to prohibiting design features that restrict access to water and other culturally significant locations, and franchise design, the CPO also prohibits: (a) Golf

Courses; (b) Resorts; and (c) Restricted Access (Gated Communities). See CDC § 3.4.50(D).

45. The Ordinance states that "Beaufort County's Gullah/Geechee community makes evident that the region's […] most important cultural resource is the people themselves." See Ord. No. 2023/18.

46. The Ordinance and the CPO define "Gullah/Geechee people" in racially explicit terms:

> The Gullah/Geechee people are descendants of enslaved people brought from West Africa and indigenous Americans from the Sea Islands […] with African roots.

See CDC § 3.4.50(A) and Ord. No. 2023/18.

47. To ensure that the County's intent was unmistakeably race-motivated, the CPO was amended to expressly incorporate the entirety of the National Park Service's "Low Country Gullah Culture: Special Resource Study & Final Environmental Impact Statement" (2005). This further confirms the race-based purpose of the CPO, as this intentionally adds more than 4,062 uses of race and race-related terms into a zoning ordinance, including the following terms and occurrences: "Africa" (355), "African American" (250), "Black" (508), "Blacks" (146), "Gullah" (2,079), "Geechee" (640), "Ethnic" (23), "Ancestry" (17), and "Race" (44).

48. Upon information and belief, no other local government in the United States has adopted a zoning ordinance that deploys more than 4,062 references to race to justify zoning restrictions for the express purpose of prompting racial separation in a community.

49. A majority of St. Helena Island is zoned under the T2R designation, which is the base zoning classification for the area and already protects the rural character of property in a race-neutral manner. See CDC § 3.2.40(A) ("The Rural (T2R) Zone is

intended to preserve the rural character of Beaufort County.") The County has confirmed that the "T2 Rural Zone implements the Comprehensive Plan goals of preserving the rural character of portions of Beaufort County." See CDC § 3.2.40(A) (T2 Rural (T2R) Standards - Purpose). When a local government has the intent of protecting rural character of land, race has no role in the analysis. Rural is rural, regardless of race.

50.     Under the T2R zone, golf courses are classified as "Permitted By Right," meaning that a property owner is able to build a golf course and accessory uses without the need for a special exception, variance or discretionary approval whatsoever from the County. See CDC § 3.1.60 (Consolidated Use Table).

51.     The CPO is purportedly imposed as an overlay district on top of the existing T2R base zoning, but once imposed, is a violation of state law by exceeding the statutorily permitted scope of an "overlay zone" and eliminating uniformity of uses within the underlying zoning district.

52.     According to Section 3.4.10 of the CDC and S.C. Code § 6-29-720 (which specifically circumscribes the powers of local governments), an "overlay zone" is a "zone which imposes a set of requirements or relaxes a set of requirements imposed by the underlying zoning district when there is a special public interest in a particular geographic area that does not coincide with the underlying zone boundaries." The CPO does not impose or relax a set of requirements. It prohibits lawful uses and imposes vague and unintelligible mandates, all on the basis of race.

53.     The CPO's geographic boundary encompasses the majority of St. Helena Island (approximately 64 square miles and 7,286 parcels).

54.     The County did not engage in any parcel-level analysis of whether individual parcels contain, abut, or affect any identified culturally significant resource and instead effectively drew a circle around St. Helena Island, while also making some arbitrary and inexplicable exclusions

55.     The inherent overbreadth of the CPO was noted prior to its enactment. The County Attorney opined during the original enactment that the CPO would be "more legally defensible if it covered the true cultural portions of St. Helena Island." The locations of culturally significant sites, such as the Penn Center, are well-known, but the County arbitrarily imposed restrictions on all of St. Helena Island.

56.     The CPO's prohibitions are immutable. Ordinance 2023/18 does not provide a property owner any mechanism to obtain a variance, conditional use permit, or any other approval to develop a golf course, resort, or gated community within the CPO district.

57.     The CPO contains no mechanism for any property owner to seek removal of their land from the CPO District.  There is no "opt out" provision in the CPO.

58.     The CPO contains no temporal limitation, no sunset provision, no evaluation mechanism, no durational limit, and no criteria by which the County can determine whether the ordinance's stated objectives have been achieved. The CPO operates as a permanent, island-wide set of prohibitions.

59.     The CPO contains no objective thresholds or standards for the terms it uses to identify the harms it purports to address. The CPO identifies "large-scale" and "rapid" growth as threats but provides no quantitative or qualitative definition of either term.

60.     Based on its terms, the CPO is perpetual in duration and not subject to reassessment based on results or efficacy.

61.     The County did not undertake any analysis before either imposing or amending the CPO to confirm that the parcels burdened had any nexus to the racial classification and culture that the Ordinance was seeking to protect.

62.     The CPO provides no objective criteria governing its application. Its operative terms are either undefined or defined in a manner in a vague and overinclusive that provides no limiting principles:

- The phrase "culturally significant" is not defined anywhere in the ordinance or the Community Development Code.

- The term "resort" is defined as "lodging that serves as a destination point for visitors and designed with some combination of recreation uses or natural areas," which has no limiting principles and includes any lodging with recreational or natural features within its prohibitive scope.[2]

- The term "restricted access (gated communities)" is not defined with sufficient specificity to distinguish between prohibited and permitted access controls.

- "Large-scale" and "rapid" growth, which the ordinance identifies as the harms it targets, are given no measurable thresholds.

---

[2] Under this definition, a rental house available for overnight stays "designed with some combination of recreational uses or natural areas," such as a dock or private beach, meet the CPO's vague and overbroad definition of "resort," rendering them illegal on Saint Helena Island although they exist in plain sight.  The following hyperlinks provides examples of resorts on Saint Helena:

- Beachfront Paradise w/ Dock
- Coastal Bliss on Coffin Point – Beachfront Retreat
- Private Beach - Ocean Front on Coffin Point
- Carolina Sunrise - Private Beach & Gorgeous Views
- Lowcountry Luxe by The Tides: Pool & Porch
- Waterfront Escape - Seasonal Pool– Perfect for Families & Friends!
- Dreamworthy, waterfront St. Helena home with pool and deep water dock

63. The CPO provides no measurable thresholds for density, traffic, infrastructure demand, acreage, population changes or any other objective and standardized planning criteria.

64. The CPO lacks these measurable standards because it does not regulate these characteristics directly or indirectly.

65. The CPO prohibits the use of a "Resort," which is not a defined land use type under the County's Land Use Definitions. See CDC § 3.1.70. The ordinance provides no explanation for prohibiting an otherwise non-existent use.

66. The CPO prohibits "Restricted Access (Gated Communities)," which is not a defined land use type under the County's Land Use Definitions. See CDC § 3.1.70.

67. The CPO provides no explanation for prohibiting an otherwise non-existent use.

68. The CPO uses definitions that are so vague and overbroad that they suppress and chill appropriate and lawful uses.

69. Although the text of the CPO claims that "the Cultural Protection Overlay District is designed to complement the underlying zoning districts on St. Helena Island," the CPO actually creates lack of uniformity and disharmony within the Rural (T2R) Zone and conflicts with underlying zoning. See CDC § 3.4.50(A).

70.  The effect of the CPO overlay is to convert uses that are "Permitted By Right" under T2R into prohibited uses within the CPO District.

71. Under T2R alone, golf courses are permitted as a use that protects the rural character of Beaufort County. However, in Rural (T2R) Zone with the CPO overlay imposed, golf courses are prohibited.

72.     The CPO prohibits golf courses, resorts, and gated communities but expressly permits uses that are comparable in or exceed the prohibited uses in scale, intensity, and impact. The CPO permits: amusement parks, go-cart tracks, mini golf courses, water parks, community and regional waste and recycling centers, and mining operations. The ordinance contains no findings explaining why the prohibited uses threaten the ordinance's stated objectives while these permitted uses do not. This is arbitrary and irrational.

73.     These features of the ordinance, among others, establish a factual basis for Plaintiffs' facial constitutional claims and claims that the ordinance is invalid under South Carolina law.

### Legislative History

74.     During the latter half of the twentieth century, Beaufort County experienced significant growth characterized by auto-oriented development patterns. These development patterns were primarily delivered through the Planned Unit Development ("PUD") mechanism, which allowed for negotiated, large-scale master planned communities. The Community Development Code acknowledges this history: "suburban places were developed primarily after the 1960's on the edges of the historic settlements of Beaufort County, many through the Planned Unit Development (PUD) process." See CDC § P.20(D).

75.     As recognized in the County's own development code reform materials, "nearly all of the county's gated communities and many commercial developments were built as a result of such agreements, exacerbating auto-oriented sprawl." These PUD-

driven developments typically included bundled amenities such as gated access, golf courses, and resort-style features.

76.     The Cultural Protection Overlay was developed during the 1990s as a response to PUD-style development. The stated purpose of the CPO was to prevent "large-scale, rapid, and/or suburban growth," including "gated, master planned communities, golf courses and resort destinations." At the time of adoption, these development types were closely associated with the PUD mechanism.

77.     In 2014-2015, Beaufort County adopted a comprehensive overhaul of its zoning framework through the Community Development Code ("CDC"), eliminating the PUD mechanism entirely, which was the type of development that the CPO was apparently adopted to prohibit.

78.     County Council agreed to eliminate PUDs as part of a broader effort to move away from negotiated, auto-oriented suburban development patterns.

79.     The CDC replaced PUDs with a form-based, transect-oriented regulatory system designed to preserve rural character, regulate density and subdivision design through objective standards, and channel growth into appropriate areas. Under this framework, the CDC now directly regulates the land development impacts the original CPO was created to mitigate, including density and intensity of development, traffic generation and infrastructure capacity, subdivision layout and access, and environmental constraints. At the same time, the underlying T2R zoning classification continued to permit golf courses by right, reflecting the County's determination that such uses are compatible with rural land use.

80.     Following elimination of PUDs, the CPO no longer regulates a distinct development mechanism but instead prohibits economically beneficial uses for race-based purposes without reference to measurable impacts. The ordinance identifies "large-scale" and "rapid" growth as the harm but provides no objective thresholds or standards for measuring those characteristics. Instead, it prohibits categories of uses historically associated with PUD development, without distinguishing between large-scale suburban development and low-intensity rural or open-space uses. Where the CDC already regulates development intensity, infrastructure demand, and rural character preservation, the CPO's categorical use prohibitions became structurally disconnected from the County's modern zoning architecture.

81.     Although the County already had zoning restrictions in place on St. Helena to protect "rural character" through the T2R base zoning designation, the County amended the CPO via Ordinance 2023/18 to impose broader and more categorical prohibitions, including a complete ban on golf courses.

82.     These amendments were enacted in direct temporal proximity to Plaintiffs' proposed development.

83.     The legislative record demonstrates that race was the predominant factor in the County's adoption and imposition of the CPO. However, Ordinance 2023/18 reinforced the CPO's race-conscious purpose by incorporating and emphasizing legislative findings tied to the protection of a specific racial and cultural group.

84.     The CPO was added on top of that existing protection for one express purpose: to protect the Gullah/Geechee community, a racially defined group, from specified land uses the County associated with encroachment on that community.

85. The race-conscious purpose and design of the CPO has been established by: (a) the text of the Ordinance, which explicitly identifies the Gullah/Geechee people by race and ancestry; (b) the Ordinance's purpose statement, which ties land use restrictions to the preservation of a specific racial group; (c) the statements and admissions of County officials confirming that the CPO was created as a race-conscious instrument; and (d) additional factors, including, but not limited to, the County's failure to consider race-neutral, less restrictive alternatives.

86. The County acknowledges that the CPO has a racial purpose and admits that the amendments to the CPO were targeted at Pine Island.

87. At the March 21, 2023 meeting of the Cultural Protection Overlay Committee, Councilmember Glover confirmed that one of the CPO Committee's "first priorities was to focus on Pine Island," confirming that the CPO amendments were specifically targeted at Plaintiffs' Property.

88. At a March 30, 2023 "community rally" hosted by members of the County's CPO District Committee, Councilmember Glover explained the CPO Committee's purpose as follows:

> [O]ne of the things that the CPO Committee is doing; there [are] two distinct cultures on St. Helena, the English Culture and the African Culture. In the English Culture, everything is by law. […] What you have to do in the English Culture is you gotta create laws. In the African Culture, if you need to go get some fish, you need to use your boat…that's the difference and so what the CPO Committee is doing is trying to make sure we can line up our Comprehensive Plan Language to the law.

89. At the same March 30, 2023 rally, Councilmember York Glover stated that the Pine Island Development is "a little yeast out there that we need to destroy."

90.     These statements by County Officials demonstrate the County's animus toward Plaintiffs' intended development and the County's intent to use its zoning authority for impermissible reasons rooted in racial and cultural exclusion.

91.     Other statements by County Officials demonstrate that the County's concern with golf courses is not driven by any race-neutral land use consideration, but rather by the County's illegitimate purpose of prohibiting a use that the County falsely and irrationally perceives to be disfavored by a specific racial group.

92.     County Attorney Brian Hulbert has publicly stated that golf courses are "repugnant to the Gullah cultural community."

93.     At the September 22, 2025 public hearing, Councilmember Lawrence McElynn stated, in opposition to the intended development, that golf courses are "in fact, incompatible land uses on St. Helena, and that those incompatible land uses would be, in fact, destructive and erosive to the Gullah culture."

94.     The County's appointee as Chairperson of the County's CPO District, Marquetta Goodwine, Committee has confirmed that the CPO District Committee sought amendments to the CPO for the purpose of endorsing race-based separation as part of the County's official land-use policy by enacting Ordinance 2023/18.

95.     In adopting Ordinance 2023/18, the County found that "it is appropriate to accept the recommendations of the Cultural Protection Overlay District Committee to amend Article 3, Division 3.4, Section 3.4.50".

96.     Goodwine claims the title of "Chieftess and 'Head pun de Bodee' or Head of State" of the "Gullah/Geechee Nation."  She confirms that the CPO's prohibitions are race-conscious, having stated under oath that "on St. Helena, constructing a golf course,

private docks, or planned unit or rapid influx development is antithetical to the protection and resiliency of the Gullah Geechee nation." ECF 15.3 (Case No. 9:23-cv-03962-RMG), ¶ 10.

97.    Goodwine and the County's CPO District Committee sought these prohibitions because they "are intimately familiar with the significant harmful impacts that resorts, gated communities, and golf courses have on Gullah/Geechee people, our cultural heritage, and our way of life." Id. at ¶ 6.

98.    If the CPO were altered, Goodwine states that "it will be Gullah/Geechees that suffer culturally, financially, emotionally, mentally and spiritually." Id. at ¶ 12.

99.    Removing any property from the CPO, according to Goodwine, "would result in the same damage, devastation of the Gullah/Geechee culture to the level which can be constituted as genocide." Id.

100.    Goodwine further states that alterations to the CPO "will do irreparable harm to a globally recognized ethnic group" and that represents "the voice and perspective that led to the original creation and refinement of the overlay district." Id. at ¶ 14; ECF 15.1 (Case No. 9:23-cv-03962-RMG).

101.    The admissions from the Chairperson of the County's Official CPO District Committee confirm that the CPO was created and amended via Ordinance 2023/18 as a race-conscious instrument designed to serve the interests of a specific racial group.

### The Intended Development Plan

102.    Plaintiffs' Property has been privately owned and restricted from public access since the 1800s and gated for at least the last 50 years. It has been utilized as a private recreation destination and investment property for almost two centuries.

103. Plaintiffs initially contracted to purchase the property in October of 2021 to pursue the intended development plan; an 18-hole golf course with associated uses and lodging and a limited number of residential units.

104. Beginning in 2021, and continuing thereafter, Plaintiffs have diligently pursued an 18-hole golf course development plan for the Property by assembling a team of engineers, surveyors, landscape architects, land planners, archaeologists, arborists and attorneys to pursue the intended development plan. These expenses are ongoing and subject to material delay.

105. On February 28, 2023, after meeting with the following County officials, who specifically advised Plaintiffs to subdivide the Property and to submit three (3) separate Conceptual Land Development applications to develop three (3) 6-hole golf courses on each parcel: Eric Greenway (County Administrator); Tom Keaveny (County Attorney); Whitney Richland (Deputy County Administrator); and Hank Amundson (Special Assistant to the County Administrator), Plaintiff closed the purchase of the Property.

106. Plaintiffs have submitted multiple applications over a three-year period, representing different procedural pathways to achieve the same underlying 18-hole development objective.

107. Plaintiffs' submissions in pursuit of the intended development have included: (i) a 2022 Zoning Map Amendment seeking "to remove the Property from the Cultural Protection Overlay (the 'CPO') boundary to permit the Developer to build ten (10) additional holes of golf, which is permitted by the base zoning on the Property (the CPO permitted the construction of up to eight (8) holes of golf);" (ii) the 2023 Conceptual Land Development Applications for three six-hole golf courses; and (iii) subsequent 2025

Zoning Map Amendment and Development Agreement applications specifically incorporating the 18-hole course with limited residential units.

108.    From initial acquisition through present, Plaintiffs' objective has remained an 18-hole golf course-centered development with limited residential density. Each submission was denied, and each denial was based on enforcement of Ordinance 2023/18 and the CPO rather than deficiencies in the underlying development concept.

109.    The Property is zoned T2R, under which golf courses are a "Permitted By Right" use. But for the CPO overlay, Plaintiffs could develop the Property for golf course operations as of right, without discretionary approval from the County.

110.    The CPO overlay automatically prohibits golf courses on the Property and within the CPO District. The injury to Plaintiffs flows directly from the Ordinance's text and operation, not from any particular application denial.

111.    Plaintiffs' intended plan of development has at all times been an 18-hole golf course with limited residences. Multiple declarations in the prior action confirm that Plaintiffs' intended plan of development has always been 18 holes of golf with limited residences and, but for the CPO, the Intended Plan of Development could be pursued as of right within the underlying zoning classification (T2 Rural (T2R)).

112.    The difference between what the CPO allows and what Plaintiffs propose demonstrates the Ordinance's irrationality. Under the CPO, Plaintiffs' 502-acre property can be developed with up to 168 residential units with approximately 90 permittable docks under the existing T2R density.

113.    Plaintiffs have previously proposed a "Downzoning Plan" through the 2025 Development Agreement process. This plan proposed a 66% voluntary reduction in

density, inclusive of an 18-hole golf course, with 82% of the property permanently protected as open space, a 90% reduction in docks, and over $100,000,000 in capital investment generating 35-70 permanent full-time jobs at an average salary exceeding $80,000. The CPO prohibits this outcome.

114. These statistics are not presented as the basis for Plaintiffs' constitutional claims, which rest on the CPO's facial invalidity. They are presented to demonstrate what the CPO prevents and to show that the ordinance is so poorly tailored to its stated purpose that it prohibits the very outcome that best achieves every goal the CPO claims to serve.

115. The CPO remains in full force and effect and continues to apply to Plaintiffs' Property.

116. The CPO expressly prohibits golf courses, resorts, and gated communities within its boundaries, and those prohibitions continue to be enforced against Plaintiffs.

117. The County has defended the race-based CPO and the amendments of Ordinance 2023/18. There is a reasonable expectation that the County will continue enforcing the Ordinance against Plaintiffs, whose Property remains within the boundaries of CPO, absent judicial relief.

118. The County has rejected every proposal by Plaintiffs that includes a golf course. Plaintiffs' inability to develop an 18-hole golf course and associated uses is not hypothetical or speculative.

119. Plaintiffs' 2022 Zoning Map Amendment was denied on June 26, 2023, Plaintiffs' 2023 conceptual land development applications were denied on April 14, 2023, and Plaintiffs' 2025 Development Agreement was denied on September 22, 2025.

120. In denying the Development Agreement, the County stated that golf is "destructive and erosive to the Gullah culture."

121. Plaintiffs withdrew their Zoning Map Amendment following the Development Agreement denial because continued prosecution of the Zoning Map Amendment was futile without a corresponding Development Agreement.

122. The Zoning Map Amendment was also subject to a six-month waiting period before it could be resubmitted.

123. This pattern of repeated denials confirms that the CPO's prohibitions are actively enforced against Plaintiffs and that any future application will be subject to the same treatment.

124. There is no administrative remedy available to Plaintiffs to obtain relief from the CPO.

125. There is no administrative appeal mechanism for: (1) denial of a zoning map amendment; (2) denial of a development agreement; (3) continued enforcement of the CPO; or (4) the unequal and arbitrary application of the ordinance.

126. As a result, Plaintiffs have no available administrative pathway to remove the Property from the CPO or to pursue their Intended Development Plan.

127. The injuries described above are present, ongoing, and directly traceable to the County's continued enforcement of the CPO.

128. The controversy is not tied to any single application or procedural posture but arises from the ongoing existence and enforcement of the CPO itself.

129.    Because Plaintiffs remain subject to ongoing constitutional injury and no administrative remedy exists, this case presents a live controversy for which declaratory, injunctive, and monetary relief is available.

130.    In reliance on the Property's underlying zoning classification and the regulatory framework in place at the time of acquisition, Plaintiffs committed substantial capital to the acquisition and planned development of the Property and undertook extensive pre-development efforts, including land planning, environmental analysis, engineering, entitlement strategy, and coordination with County officials. These efforts were undertaken with the reasonable expectation that the Property could be developed in accordance with its permitted uses and the County's stated regulatory regime.

131.    Following these investments, the County enacted and subsequently enforced regulatory restrictions that materially altered, impaired, and ultimately prevented the planned development of the Property. As a direct result of these actions, Plaintiffs have been unable to proceed with development for an extended period, causing ongoing delay and substantial economic harm. During this period, Plaintiffs have incurred continuing carrying costs associated with ownership of the Property, including taxes, maintenance, and capital costs, while also sustaining the loss of productive use of significant invested capital.

132.    The delay caused by Defendant's conduct has further resulted in materially increased development costs due to inflation, escalation in construction pricing, and changes in market conditions. In addition, Plaintiffs have been required to expend substantial additional resources on professional services, including legal, planning, and

consulting efforts, in order to respond to Defendant's actions and attempt to advance the project through an irregular and obstructed administrative process.

133.    These harms are not speculative or contingent. They are concrete, ongoing, and directly attributable to Defendant's enactment and enforcement of the challenged regulatory framework and related conduct. Plaintiffs' injuries include, but are not limited to, the loss of reliance expenditures, delay-based damages, increased development costs, and the continued inability to realize the economic use and value of the Property as permitted under its underlying zoning classification.

134.    In 2022, in pursuit of the Intended Development Plan, Plaintiffs engaged in pre-application coordination with the County regarding a Zoning Map Amendment ("ZMA") to remove the Property from the Cultural Protection Overlay ("CPO"), which would have allowed the intended development of an 18-hole golf course, consistent with the underlying Rural (T2R) Zone.

135.    County officials directed Plaintiffs to pursue the ZMA as the appropriate regulatory pathway and confirmed that golf-related uses were permitted under the then-existing framework.

136.    After submission of the ZMA, the County requested that the application remain "active but pending" while the County pursued amendments to the CPO in direct response to Plaintiffs' proposed use.

137.    During this period, County officials acknowledged that the CPO lacked a logical nexus to its stated purpose and that golf courses under nine holes were permitted under the existing ordinance.[3]

---

[3]    See https://www.youtube.com/live/nPqx2_jYMns?si=RNffDpCivjuOES_u

138.   Rather than process the ZMA under the governing regulations in place at the time of submission, the County advised Plaintiffs to subdivide the Property and submit Conceptual Land Development Applications ("CLDAs") for multiple sub-nine-hole golf courses.

139.   Plaintiffs followed the County's directive and submitted CLDAs. In doing so, Plaintiffs were pursuing the same underlying 18-hole development objective through the procedural workaround that the County specifically advised Plaintiffs to undertake.

140.   The CLDAs were reviewed and denied by the Planning Director on April 14, 2023 through an administrative process, while the ZMA remained pending and subject to legislative determination by County Council.

141.   Having been denied in April 2023, the CLDAs are no longer at issue.

142.   A conceptual land development application is an administrative review of a specific proposal under existing regulations, whereas a zoning map amendment is a legislative determination that alters the governing regulatory framework itself.

143.   The County has engaged in a coordinated series of procedural deviations designed to prevent the ZMA from being considered under the regulatory framework in effect at the time of submission.

144.   Specifically: (i) the County delayed substantive consideration of the ZMA while concurrently pursuing amendments to the CPO and the land use definition of "Golf Course;" (ii) County officials redirected Plaintiffs into alternative procedural pathways that were unavailable, inapplicable, or less favorable to Plaintiffs' proposed development; (iii) the County advanced text amendments without the required applications or staff analysis, in contravention of the County's own procedural requirements; and (iv) the County

enacted Ordinance 2023/18 while Plaintiffs' ZMA remained pending, resulting in the application of new regulatory standards to a previously submitted application.

145. Furthermore, County Council advanced and adopted Ordinance 2023/18 through a procedurally irregular process, including conducting first and second readings prior to Planning Commission review and labeling the process "time-sensitive" to accelerate adoption.

146. The Planning Director acknowledged that the process was "a little unusual."

147. Furthermore, the County altered the substance of the National Park Service study to expand site-specific concerns into a generalized justification for island-wide prohibitions.

148. The CPO includes a finding that golf courses and other land uses are "all encroaching upon and in some cases overtaking Gullah/Geechee Culture." See CDC § 3.4.50(D). To create this finding, the County adulterated wording from the National Park Service Study by deleting the phrase "baptismal sites" and substituting "Gullah/Geechee Culture." Nowhere within the 435-page study is there a recommendation or even suggestion that local governments should ban golf courses, resorts, or franchise design.

149. The County Planning Director, in coordination with outside organizations, presided over these verbiage manipulations in a meeting of the CPO Committee where it was stated: "just put Gullah culture. And that way, what you do is, you make it a County finding."

150. In multiple meetings with Plaintiffs and Plaintiffs' team, Councilmember York Glover cited a "Federal Document that said golf courses destroy Black Neighborhoods" in apparent reference to the National Park Service Study.

151. The National Park Service Study does not state that golf courses destroy Black neighborhoods.

121. The 2022 Zoning Map Amendment was ultimately denied by County Council through an independent legislative decision, leaving Plaintiffs' Property subject to the continued enforcement of the amended CPO.

122. The denial of the 2022 Zoning Map Amendment remains unadjudicated and constitutes an ongoing injury for which no administrative remedy exists.

### 2025 Development Agreement and Zoning Map Amendment Proceedings

123. In 2025, Plaintiffs pursued removal of the Property from the Cultural Protection Overlay ("CPO") through a (different from 2022) Zoning Map Amendment ("ZMA") together with a Development Agreement ("DA"), as contemplated by the Community Development Code. The ZMA and the DA were not separate in any practical sense, in fact, they were entirely co-dependent. The ZMA sought removal of the Property from the CPO so that the Property would be governed by its underlying T2 Rural zoning, while the DA was the mechanism through which Plaintiffs proposed to make the resulting intended development, density limits, open-space protections, and community benefits binding and enforceable. It was necessary for the proposal to be considered as a unified package: future rural zoning plus a binding development agreement.

124. The Planning Director and Staff repeatedly attempted to advance consideration of the ZMA without the DA and then evaluated the DA as if the ZMA had not been requested. However, allowing staff to treat the ZMA as a bare request to "build a golf course," while simultaneously treating the DA as inconsistent with existing zoning

because the CPO remained in place, is contrary to the procedure set forth in the CDC, as well as South Carolina law.

125. On April 7, 2025, Plaintiffs filed a formal Zoning Map Amendment application requesting removal of the Property from the CPO and retention of the base T2R zoning. The application identified 437 developable acres and stated its reason for request as follows: "To downzone 437 developable acres with deed restrictions, to reduce density and impacts, to protect green and open space, and to provide guaranteed community benefits, investment and sustainable economic development on Saint Helena Island through a project consisting of 49 residential units and an 18-hole golf course upon removal from the Cultural Protection Overlay (CPO) and entering a development agreement which allows for the downzoning and benefits to become fully binding and enforceable." Plaintiffs also attached the required Traffic Impact Analysis.

126. On April 17, 2025, Plaintiffs submitted the associated Development Agreement application and paid the required fee of $28,110.00.

127. Plaintiffs expressly communicated to the Planning Director that the ZMA and DA had to be considered together as a unified proposal rather than as disconnected components because the ZMA would restore the governing zoning to T2 Rural, and the DA would then impose the reduced density, open-space protections, and public benefits that made the proposal more protective than development otherwise allowed by right.

128. Despite submission of a complete application package, the County delayed formal acknowledgment of the DA.

129. On May 7, 2025, the Planning Director issued a Completeness Letter confirming that the Development Agreement application was complete and outlining the

review process. That acknowledgment triggered the County's obligations under CDC § 7.4.40(A) and confirmed that the DA was in active review.

130. Pursuant to CDC § 7.4.40(A), the Planning Director expressly acknowledged that: deficiencies would be identified, the applicant would be given an opportunity to respond, a staff report would be prepared in accordance with CDC § 7.4.40, and legal review would occur prior to transmittal to County Council.

134. After acknowledging the applicable review process governing the Development Agreement application, the County failed to comply with the obligations under CDC § 7.4.40(A), despite repeated requests by Plaintiffs.

135. On May 14, 2025, at the request of Plaintiffs, the County further acknowledged the interdependence of the two applications by deferring the ZMA for good cause so that the DA could be reviewed first and the two matters could proceed in tandem. This decision reflected the understood reality that the DA gave legal and practical meaning to the requested ZMA, and that the ZMA gave legal foundation to the proposed DA.

136. After initially recognizing that tandem review was necessary, the Planning Director later reversed course and denied a materially identical deferral request under the same governing standard and substantially the same circumstances, without any meaningful explanation for the change in position.

137. On August 12, 2025, Plaintiffs' counsel requested deferral of the ZMA from the September 2 Natural Resources Committee meeting, citing identical circumstances. Counsel stated: "This request, the reasons for the request, and the purpose of the request are identical to our previous deferral request that was granted for good cause by the

Director on May 14th, 2025." County Attorney Hulbert responded: "I am certain that Rob [Merchant] will take all appropriately consider all factors and circumstances in making his decision. But please recognize it is his decision to make, not yours or mine." Legal counsel replied: "I acknowledge that this decision rests with Rob under the CDC. Given the circumstances—unchanged since his last finding of good cause—this should be a straightforward, perfunctory determination."

138.    As acknowledged by the County Attorney, that decision rested solely with the Planning Director.

139.    On August 21, 2025, the Planning Director issued a formal letter denying the deferral request: "After careful consideration we have not found good cause to defer consideration of this zoning map amendment pursuant to Section 7.4.60 of the [CDC]."

140.    Yet, the circumstances that supported the Planning Director's finding of good cause on May 14, 2025, had not changed.

141.    The CDC states that the Director "shall consider and decide the deferral request" and that deferral "shall be approved" upon a finding of "good cause." The Planning Director reversed his own finding under identical circumstances with no explanation.

142.    On August 26, 2025, Plaintiffs wrote directly to Chairperson Howard requesting deferral, stating: "Notwithstanding the prior determination of good cause, the reason for good cause remaining unchanged, and Council now wishing to negotiate the Development Agreement, Mr. Merchant has refused further deferral. Council's decision to negotiate the Development Agreement cannot be squared with Mr. Merchant's decision." The same day, the Chairman of the Natural Resources Committee and Chair

of County Council overrode Mr. Merchant's denial and granted the deferral. The elected officials' intervention confirms that the Planning Director's reversal was unsupported and inconsistent with the will of the governing body.

143. The deliberate fragmentation created structural disadvantage: the DA was not reviewed in the correct legal framework because it was evaluated against existing zoning (with the CPO) that the applicant was simultaneously asking to change.

144. The Pine Island ZMA Staff Report mischaracterized the application by stating that the request was being made because the "CPO does not permit golf courses." However, the actual application described a downzoning proposal with deed restrictions, reduced density, green and open-space protections, guaranteed community benefits, investment, and sustainable economic development, all to be made binding through the DA. That mischaracterization was not harmless.

145. Once the ZMA was separated from the DA, the Planning Director deliberately omitted or minimized the very features that made the proposal less intensive and more protective than what the Property could otherwise support under the base zoning.

146. The Staff Report omitted a standard "Proposed Zoning" section even though the entire request was to remove the Property from the overlay so that it would be governed by the underlying T2 Rural zoning.

147. The Staff Report omitted any future land use categorization even though the future land use was "Rural" and the requested zoning change would align with the future land use, remaining "Rural."

148.    The Staff Report omitted entirely any review of the Traffic Impact Analysis ("TIA"), which Plaintiffs were required to submit in conjunction with the DA application.

149.    Plaintiffs incurred significant time and expense in preparing the TIA, which was reviewed and approved by the County Traffic Engineer.

150.    The Planning Director omitted the results of the approved TIA showing a reduction in traffic.

151.    The Staff Report introduced speculative density analysis and inapplicable references, including Rural Small Lot Subdivision concepts, which inflated the perceived threat of the Property while obscuring that Plaintiffs were proposing only 49 residential units under a binding framework.

152.    The Staff Report reduced the issue of community need to a conclusory sentence stating that "[t]his proposed zoning map amendment does not address any known community need in the Cultural Protection Overlay Zone of St. Helena Island" despite the submission of extensive materials showing community benefits and reductions in impacts.

153.    The Staff Report cited an alleged lack of "sufficient information" to assess the adequacy of public service providers despite the submission of five (5) letters from the public service providers stating they would serve the development.

154.    Most importantly, the ZMA Staff Report refused to present the application as it was submitted, i.e., a request to remove the Property from the CPO in conjunction with a binding DA that would reduce density, preserve open space, provide investment, and impose enforceable limits.

155.    By separating the DA from the ZMA, Staff evaluated the DA as though the existing CPO zoning remained in effect thereby enabling Staff to conclude that the DA depended on a use not authorized under current zoning.

156.    Staff's conclusion that the DA was unacceptable based on the existing CPO was procedurally improper, logically inconsistent, and contrary to applicable law.

157.    Sections 7.3.10(D)(11)(b), 7.3.10(D)(5), and 7.3.10(D)(13) of the CDC expressly contemplate review of a Development Agreement under anticipated future conditions where a concurrent zoning change is a component of the application, as was the case here. Staff's failure to apply those provisions, and its evaluation of the DA as though no ZMA were pending, was contrary to the plain language of the CDC.

158.    The purpose of the ZMA was to remove the Property from the CPO so that the future governing zoning would be T2 Rural, which allows golf courses. Therefore, the DA needed to be evaluated under the future zoning framework requested by the application and required by the CDC. The Planning Director refused to do so.

159.    These procedural irregularities created a closed loop: the ZMA was attacked without the DA, and the DA was attacked because the ZMA had not yet been granted. The County's procedural improper approach ensured denial of Plaintiffs' ZMA and DA applications regardless of the merits.

160.    On August 20, 2025, at a Special Called Council Meeting, Plaintiffs first learned that a legally required Staff Report and a staff recommendation on the Development Agreement existed when Councilmember Glover publicly stated that he intended to vote against negotiating the DA and would support the staff recommendation.

161. Staff had completed and transmitted the report to Council without the applicant's knowledge. The applicant never received the staff report, had not been informed of any deficiencies, and had not been given the opportunity to address staff concerns.

162. The CDC specifically contemplates review of a Development Agreement under future or proposed zoning conditions when a zoning change is part of the DA. See CDC §§ 7.3.10(D)(11)(b), 7.3.10(D)(5), and 7.3.10(D)(13).

163. Counsel for Plaintiffs made written demands on May 16, 2025, June 23, 2025 and July 21, 2025 that Staff's evaluation be based solely on the proposed T2R zoning without the CPO. Nevertheless, Staff repeatedly evaluated the DA under existing zoning with the CPO, contrary to the applicable provisions of the CDC.

164. Although the County assured Plaintiffs that it would "endeavor" to follow the CDC and applicable law, the outcome of the 2025 ZMA and DA proceedings reflects the ongoing procedural unfairness and animus directed at preventing Plaintiffs from obtaining relief from the CPO.

165. Plaintiffs' ZMA and DA applications were on the agenda for the September 22, 2025 County Council meeting.

166. During the September 22, 2025 meeting, County Council evaluated the DA under existing CPO constraints rather than the future zoning framework requested through the ZMA.

167. A motion was made during the September 22, 2025 County Council meeting to:

> approve the first reading of the Ordinance to authorize a Development Agreement between Pine Island Property Holdings, LLC, and Beaufort

County pursuant to South Carolina Code of Laws Section 6-31-30 with the understanding that negotiations continue between the County and the applicant to attempt to reach terms which are acceptable to both parties and which provide clear, adequate, and enforceable measures, while remaining consistent with the goals and objectives of the Comprehensive plan, the Community Development Code and all other Beaufort County Ordinances.

168. The motion to approve the first reading of the Ordinance to authorize the DA failed by a vote of 2:9.

169. Councilmember McElynn stated that County Council must decide whether the DA is "in accordance with the CPO."

170. Councilmember McElynn then moved to not approve the Ordinance to authorize a DA, which was seconded by Councilmember Glover. The motion not to approve the DA passed by a vote of 10:1.

171. By requiring consistency "in accordance with the CPO," the unified proposal was never evaluated on its actual terms, and the process ensured denial without consideration of the DA under the correct legal and regulatory framework.

172. Without the corresponding DA, the ZMA request was futile. As a result, Plaintiffs withdrew ZMA following County Council's vote to deny approval of the DA.

173. At the same time Plaintiffs were pursuing the ZMA and DA, a separate applicant, Pulte Home Company ("Pulte") submitted a rezoning and associated Development Agreement application for the development of Ramsey Farms ("Ramsey Farms").

174. The Ramsey Farms and Pine Island applications followed the same procedural pathway, i.e., Zoning Map Amendment paired with a Development Agreement, processed through the same Planning Department, under the same Planning Director, during the same timeframe, governed by the same CDC, and South Carolina law.

175. Despite these identical circumstances, the County afforded Ramsey Farms a materially different review: staff summarized the application as submitted, incorporated supporting materials, applied the review criteria to the actual proposal, treated the Development Agreement as an integrated planning tool, and permitted the applicant to address deficiencies before the staff report was issued.

176. Plaintiffs were denied that same process. The Planning Director severed Plaintiffs' unified proposal, forced the ZMA forward without the DA, and evaluated the DA through the lens of the existing overlay Plaintiffs were seeking to remove thereby rendering both applications artificially deficient. Standard report sections were omitted, favorable evidence was excluded, and Plaintiffs were denied the opportunity to cure identified deficiencies prior to staff recommendation. Staff demonstrated it knew how to conduct a neutral, application-specific review and chose not to do so for Plaintiffs.

177. The prohibitions of the CPO are not borne by all property owners in the County, or even within the CPO, even though Gullah/Geechee residents live throughout the County.

178. Under the CDC, for any property zoned T2R in Beaufort County, using the property as a "recreation facility: golf course" is "Permitted by Right." Consistent with that policy, the County has continued to approve golf course development in rural T2R areas outside the CPO.

179. In 2023, after the adoption of Ordinance 2023/18, the County approved an 11-hole golf course at 68 Callawassie Drive in Okatie, a rural T2R-zoned area. While landowners in Beaufort County with parcels zoned T2R are permitted by right to use the property as a golf course, a similarly situated landowner in Beaufort County with parcels

zoned T2R located on St. Helena Island is prohibited from the same use because of the County's intention to protect members of a specific race.

180. Elsewhere in Beaufort County, golf courses are permitted in overlay districts designed for comparable purposes.

181. The Daufuskie Island Heritage Corridor Overlay ("HCO") permits golf courses. The Coosaw Island Rural Community Preservation overlay permits golf courses. Both overlays serve cultural and rural preservation purposes similar to the CPO, yet neither bans golf.

182. The structural contrast between the CPO and the County's HCO on Daufuskie Island, which the County describes as "Beaufort County's most notable concentration of Gullah culture," demonstrates the CPO's anomalous breadth. The HCO is limited to a defined overlay corridor extending 200 feet from the centerline of identified streets, with inclusion of parcels abutting that corridor; the overlay otherwise defers to the underlying zoning except where additional, targeted standards apply. The HCO burdens 277 parcels and permits golf courses and resort uses. Ordinance 2023/18 imposes blanket restrictions across 7,286 parcels without any comparable boundary criteria, buffer limitations, or corridor-based logic. Despite comparable stated purposes, the County employed geographically targeted restrictions on Daufuskie Island while imposing a total prohibition on St. Helena Island.

183. For years, the County has repeatedly advanced the theory that the CPO's restrictions apply uniformly to all landowners located within its boundaries in the exact same way as they apply to Plaintiffs.

184. The following statement has appeared in every staff report issued by the Planning Director regarding Plaintiff's intended development: "CULTURAL PROTECTION OVERLAY (CPO) ZONE BOUNDARIES: The boundaries of the CPO apply to all of St. Helena Island with the exception of Fripp, Harbor, Hunting, Dataw Islands and the unbridged barrier islands including Pritchard, Capers, St. Phillips and Bay Point Islands. The applicability statement in the original CPO (1999) states that "the CPO District requirements apply to new uses; it is not the intent of this section to create nonconforming use of existing uses. Subdivisions, PUDs and other developments approved prior to the adoption of the 1999 Zoning Development Standards Ordinance (ZDSO) are exempt from the requirements of this section." In 1999, Fripp, Harbor and Dataw Islands had well established development patterns and were excluded from the CPO to avoid rendering these communities nonconforming. The originally established boundary of the CPO remained unchanged when the CPO was adopted as part of the Community Development Code in 2014."

185. The Planning Director made the following comments during the County Council meeting held on September 22, 2025:

> The other thing that we looked at, and this was in the zoning map amendment two years ago, is the very question of the boundaries of the cultural protection overlay district. Because the question is, were they drawn correctly? What was the intention of how they were drawn?[4]

186. The Planning Director continued to describe the exclusion of Dataw Island, Fripp Island and Hunting Island as excluded as the ordinance "deliberately said that the boundaries were drawn to exclude those" and those were the only exceptions.

---

[4] See https://www.youtube.com/live/57yIFHTr_rE?si=8x-01PNfzGJnte41&t=14585

187.    However, the CPO's own boundaries demonstrate that it does not uniformly apply to all landowners on St. Helena Island.

188.    As confirmed on publicly available zoning maps and Beaufort County Geographic Information System records, there are two parcels located on Yard Farm Road that have been excluded from the CPO despite being: (i) located on St. Helena Island; (ii) situated within the Corners Community, which the County has formally recognized as the geographic and cultural "core" of St. Helena Island; and (iii) outside of any pre-1999 subdivision, PUD, or established resort community that would become nonconforming if included in the CPO.

189.    The CPO's prohibitions have been selectively enforced since the enactment of Ordinance 2023/18. The County has approved uses within the CPO district that are functionally identical to or more intensive than the uses it prohibits Plaintiffs from pursuing:

(a) Orange Grove Plantation: The County approved a luxury wedding resort operating within the CPO district as a commercial lodging and event destination with overnight accommodations, gated access, and fee-based operations. This meets the CPO's definition of "resort" as "lodging that serves as a destination point for visitors and designed with some combination of recreation uses or natural areas."

(b) Yard Farm RV Resort: A gated commercial lodging facility with approximately 111 RV slips, clubhouse, recreational amenities, and two gated entrances, located on parcels within the declared boundaries of the CPO and within the Corners Community yet these parcels are exempted from the CPO and the County approved this development. The Yard Farm facility meets the CPO's definitions of both "Restricted Access (Gated Communities)" and "Resort," yet operates without restriction. The County has never publicly disclosed or explained the exemption of these parcels.

(c) Penn Center: An institution operating within the CPO district as a destination resort and hotel, hosting conferences, weddings, retreats, and overnight accommodations—despite the CPO's express prohibition on "resorts." No enforcement action has been taken.

190. Daryl Orage served as the Vice Chairman of the Cultural Protection Overlay Committee.

191. Mr. Orage is a St. Helena Island resident, a farmer, a commercial crabber, a recreational fisherman, and a graduate of Penn School Nursery. Between April and June 2023, Mr. Orage made a series of public statements acknowledging critical deficiencies in the CPO process.

192. As Vice Chairman of the County's own CPO Committee, Mr. Orage formally requested that the County facilitate a balanced presentation of both development options for Plaintiffs' Property, including all impacts, so that the Committee, Council, and public could make an informed decision. The County did not respond to or honor that request.

193. Despite Mr. Orage's position within the County's advisory body, the County proceeded with a process in which only one-sided information was presented, and material facts about the Pine Island proposal, including its reduced density and public benefits, were not fully or fairly conveyed to decision-makers or the public.

194. Mr. Orage publicly stated that the community had been misled and that the decision-making environment lacked complete information. Despite Mr. Orage's warnings, the County continued without correcting the record, resulting in a process that suppressed balanced public participation and relied on an incomplete and distorted understanding of the proposal.

195. On eve of the September 22, 2025 public hearing on the DA, Councilmember York Glover directly contacted Sallie Anne Robinson, a multi-generational Gullah Geechee community member from Daufuskie Island, and instructed her not to speak about Pine Island during the September 22, 2025 County Council

meeting despite her intent to participate and ask questions regarding matters affecting her community.

196. As a result of this communication, Ms. Robinson was deterred from participating in the public hearing, ultimately choosing not to attend and thereby removing a knowledgeable and directly affected community voice from the process.

197. The suppression of Ms. Robinson's participation prevented the public from hearing testimony regarding both the substance of the Pine Island proposal and the potential benefits to Gullah Geechee communities, including a proposed $75,000 contribution for a long-overdue cemetery survey on Daufuskie Island.

198. Furthermore, prior to a December 8, 2025 Council meeting where the vote to deny Plaintiffs' Development Agreement was scheduled to be rescinded due to a lack of transparency, Plaintiffs learned that the Chair of County Council, Alice Howard, had contacted the Executive Director of the Beaufort Jasper Housing Trust (BJHT), and told him to not be present at the December 8th County Council meeting.

199. BJHT is the County's appointed entity charged with the creation and provision of Affordable Housing throughout Beaufort County.

200. Prior to December 8, 2025, Plaintiffs had worked diligently with BJHT to negotiate a transformational package of Affordable Housing financial support that was directly codified in the DA.

201. Multiple members of County Council had not been afforded to hear directly from the Executive Director of BJHT and had requested that he be available for any potential discussion items.

202. By requesting that the Executive Director of BJHT not attend the December 8, 2025 Council meeting, the Chair of County Council eliminated the opportunity for other Councilmembers to learn about the "transformational" Affordable Housing components of the proposal by Plaintiffs.

203. Through the actions of its elected officials, the County interfered with and suppressed meaningful public participation, limiting the scope of discourse presented to decision-makers and undermining the fairness, openness, and integrity of the public hearing process.

### Relocation of the September 22, 2025 Public Hearing

204. On September 22, 2025, Beaufort County Council convened a public hearing on Plaintiffs' applications at Burton Wells Recreation Center in Beaufort, a venue change from the previously approved location at Buckwalter Recreation Center in Bluffton.

205. Chairperson Howard admitted on the record that the relocation was made at the request of Councilmember York Glover.

206. Plaintiffs' Property is in Councilmember Glover's district.

207. The relocation was made unilaterally, without a vote or discussion among the full Council, and in a deviation from the County's own established scheduling procedures.

208. Multiple councilmembers objected on the record, with Councilmember Cunningham expressly stating that the change was made "because of one item on the agenda" and that no comparable venue relocation had been made for any prior zoning matter.

209. The relocation materially altered the conditions of public participation. While Bluffton provided geographically balanced access across the County, the venue change placed the hearing in closer proximity to constituencies aligned with organized opposition to Plaintiffs' proposal. The relocation also imposed additional travel burdens on residents who were more likely to support it. The result was a public record disproportionately reflecting opposition sentiment.

210. The relocation further constitutes selective treatment of the Pine Island application when compared to other zoning matters that were not afforded similar venue adjustments.

211. The relocation of the meeting venue, when considered in conjunction with other procedural irregularities in the Pine Island review process, demonstrates a pattern of conduct designed to influence the outcome of the decision-making process.

212. As a result of the County's actions, Plaintiffs have suffered and continue to suffer damages, including, but not limited to: (i) diminution in property value resulting from the unconstitutional CPO's prohibition on golf courses, resorts, and gated communities; (ii) deferred and delay-based damages, increased development costs, and ongoing carrying costs; (iii) expenditures of significant sums on design, engineering, planning, and related professional services, including teams of engineers, surveyors, landscape architects, land planners, archaeologists, historians, arborists, and attorneys; (iv) amounts expended on zoning map requests and prior applications that were wrongfully denied; (v) lost opportunity costs; (vi) physical harm to Plaintiffs' property; and (vii) reasonable attorney's fees and costs incurred by Plaintiffs in contesting the County's actions taken without substantial justification.

**Damages**

213.   As a direct and proximate result of the County's enactment, maintenance, and enforcement of the CPO and related regulatory conduct, Plaintiffs have suffered substantial economic injury, including but not limited to the following categories:

(a) **Reliance Expenditures and Pre-Regulatory Investment Losses**

i.   Plaintiffs incurred substantial expenditures in reasonable reliance on the lawful development rights associated with the Property, including acquisition costs, entitlement strategy, planning, engineering, environmental studies, design, and professional services.

ii.   These expenditures were undertaken in anticipation of developing the Property consistent with the governing zoning framework and County representations prior to the challenged regulatory actions.

iii.   The subsequent regulatory changes and enforcement actions materially impaired or rendered unusable these investments, causing direct economic loss.

(b) **Regulatory Delay and Carrying Costs**

i.   The challenged ordinance and its administration have prevented Plaintiffs from proceeding with development for an extended period, resulting in multi-year delay.

ii.   During this period, Plaintiffs have incurred ongoing carrying costs, including but not limited to property taxes, insurance, maintenance, financing costs, and opportunity costs associated with immobilized capital.

iii.   These delay-based damages represent a continuing injury tied directly to the County's regulatory interference.

(c) **Increased Development and Construction Costs**

i.   The delay caused by Defendant's actions has resulted in materially increased development costs, including escalation in labor, materials, permitting, and construction pricing.

ii.   These cost increases are directly attributable to the time period during which Plaintiffs were prevented from proceeding with development.

iii.   Plaintiffs have therefore suffered additional economic harm beyond initial reliance expenditures.

(d) **Additional Professional, Administrative, and Legal Costs**

i.   Plaintiffs have been required to expend substantial additional resources responding to Defendant's actions, including engaging legal counsel, land-use professionals, consultants, and experts.

ii.   These costs include efforts to navigate the County's administrative process, respond to procedural irregularities, pursue entitlements, and protect Plaintiffs' property rights.

iii.   These expenses would not have been incurred but for the challenged conduct.

(e) **Capital Immobilization and Loss of Use of Funds**

i.   Plaintiffs deployed significant capital to acquire the Property and advance development, which has remained unproductive due to regulatory interference.

ii.   The inability to deploy this capital into productive use has resulted in measurable financial loss, including lost investment return and opportunity cost over time.

iii.   This category of damages reflects the economic impact of delay independent of project-specific revenues.

(f) **Loss of Development Value and Economic Use**

i.   The challenged ordinance and its enforcement have interfered with Plaintiffs' ability to realize the economic use and value of the Property consistent with its underlying zoning and permitted uses.

ii.   This includes impairment of planned development, reduced utility of the Property, and loss of economically viable use during the period of regulatory restriction.

iii.   These harms are ongoing and will continue unless relief is granted.

iv.   Plaintiffs have suffered substantial economic damages as a direct result of Defendant's actions.

v.   The full extent of such damages will be proven through expert testimony, financial analysis, and evidence at trial.

214. Plaintiffs seek all available relief under federal law, including but not limited to compensatory damages, costs, attorneys' fees, and such other relief as the Court deems just and proper.

## COUNT I

**Violation of the Equal Protection Clause of the Fourteenth Amendment
(Facial Challenge) – 42 U.S.C. §1983**

215. Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

216. Ordinance No. 2023/18, codified at Section 3.4.50 of the CDC, is unconstitutional on its face in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

217. The CPO expressly identifies and targets the entire geographic area of St. Helena Island based on the presence of a distinct race-associated cultural community, and incorporates findings and purposes tied to the historical and demographic composition of St. Helena Island, defined in racially explicit terms, i.e., "descendants of enslaved people brought from West Africa and indigenous Americans from the Sea Islands." See CDC § 3.4.50(A).

218. The text of the CPO itself, along with the incorporated legislative findings and legislative history, confirms that the County's enactment and enforcement of land use restrictions on St. Helena Island is for the stated purpose of protecting a specific race and race-associated cultural identity.

219. The CPO broadly and categorically prohibits: (a) the following land uses: (i) restricted access (gated communities); (ii) resorts; and (iii) golf courses; and (b) any site

design that restricts access to: (i) "water;" (ii) "other culturally significant locations;" and (iii) "franchise design." See CDC § 3.4.50(C) and (D).

220.    The CPO's prohibitions and restrictions on the use and development of property within the CPO District, including prohibitions on otherwise lawful uses such as golf courses, gated communities, and resorts, burden 7,286 parcels on St. Helena Island without regard for individual circumstances.

221.    On its face, the CPO expressly identifies and regulates based on a specific racial classification. Ordinance 2023/18 identifies St. Helena Island as being "home to one of the largest Gullah/Geechee communities on the southeast coast" and specifically defines Gullah/Geechee people as "people [who] are descendants of enslaved people brought from West Africa and indigenous Americans from the Sea Islands." See CDC § 3.4.50(A).

222.    Under controlling Supreme Court precedent, "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227 (1995).

223.    Ordinance 2023/18 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because the CPO: (i) is a race-conscious ordinance to which strict scrutiny applies; (ii) does not further a compelling governmental interest; and (iii) is not narrowly tailored to accomplish the stated purposes of the ordinance.

224.    Preserving demographic segregation of St. Helena Island in the name of "cultural protection" is not a compelling governmental interest.

225.   Furthermore, the CPO is not narrowly tailored to achieve any compelling governmental interest because it imposes sweeping, categorical land-use restrictions without consideration of less restrictive alternatives and without any individualized determination of necessity or impact.

274.   When adopting Ordinance 2023/18, a race-based policy prohibiting entire classes of land uses throughout an area encompassing the entirety of St. Helena Island, the County did not consider or adopt less restrictive, race-neutral alternatives to achieve the stated purpose of the CPO.

275.   The CPO itself identifies specific cultural sites, e.g., the Penn Center, burial grounds, places of worship, that could be protected through narrowly tailored measures rather than broad-scale bans.

276.   The CPO provides no individualized or parcel-specific analysis and applies uniformly across all properties within the CPO District regardless of proximity to any identified cultural resource.

277.   The CPO imposes race-based prohibitions and restrictions that are perpetual in duration and unlimited in time.

278.   There is no set of circumstances under which the CPO could be constitutionally  applied: (i) to prohibit land uses, including restricted access (gated communities), resorts, and golf courses, and "design features that restrict access to water and other culturally significant locations, and franchise design" within the District Boundaries encompassing 7,286 parcels and approximately ninety-nine percent (99%) of St. Helena Island; and (iii) through the County's official land-use policy has been enacted for the express purpose of protecting a specific ethnicity, which is defined in the CPO as

"descendants of enslaved people brought from West Africa and indigenous Americans from the Sea Islands," from encroachment by land uses and design features "deemed to be incompatible" with the culture of St. Helena Island, which "is home to one of the largest Gullah/Geechee communities on the southeast coast." See CDC § 3.4.50.

279.    The CPO employs an express racial classification, fails to further a compelling governmental interest, is not narrowly tailored, and no set of circumstances exist under which the CPO would be valid.

280.    The CPO is therefore facially invalid.

281.    In enforcing the CPO, the County has acted under the color of state law.

282.    The County has deprived Plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment in violation of 42 U.S.C. § 1983.

283.    Plaintiffs are entitled to declaratory and injunctive relief invalidating Ordinance 2023/18, as well as damages under 42 U.S.C. § 1983.

## COUNT II

**Violation of the Equal Protection Clause of the Fourteenth Amendment
(As-Applied Challenge) 42 U.S.C. §1983**

284.    Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

285.    Plaintiffs own real property located within Beaufort County that is zoned T2R (Rural).

286.    Under the T2R zoning classification in Beaufort County, using the property as a "Recreation Facility: Golf Course" is "Permitted by Right." See CDC § 3.1.60.

287.    Plaintiffs are similarly situated to other property owners with parcels zoned T2R in Beaufort County.

288. Plaintiffs sought to develop the Property in a manner consistent with the uses permitted within the T2R zone and comparable to developments that the County has permitted on similarly situated properties within Beaufort County but has been repeatedly denied.

289. The County has permitted golf courses in comparable overlays elsewhere in Beaufort County (Daufuskie Island, Coosaw Island) while banning them on St. Helena Island.

290. The County has treated Plaintiffs differently from other similarly situated landowners in Beaufort County, and the unequal treatment was the result of intentional or purposeful discrimination by the County.

291. Notwithstanding Plaintiffs' compliance with applicable zoning requirements, the County applied the CPO to the Property to prohibit the development or otherwise restrict the use that is otherwise permitted as of right by the T2R zoning classification.

292. As applied to Plaintiffs, the CPO categorically prohibits uses including, but not limited to, golf courses, resorts, and gated communities, that are permitted for similarly situated properties zoned T2R within Beaufort County that are not subject to the CPO.

293. The County has delayed and denied Plaintiffs' pursuit of the intended development by applying the CPO to the Property while simultaneously allowing similarly situated properties outside of the CPO District to proceed with uses permitted by the underlying T2R zoning.

294. The County's Officials have made discriminatory statements relating to Plaintiffs' intended development.

295. The County applied the CPO to Plaintiffs in a disparate manner.

296.    The County lacked a rational basis for treating Plaintiffs differently than similarly situated property owners and applications within Beaufort County.

297.    As applied to Plaintiffs, the CPO is not rationally related to a legitimate governmental interest.

298.    The application of the CPO to Plaintiffs is arbitrary, capricious, and not supported by any legitimate, non-pretextual governmental objective.

299.    As applied to Plaintiffs, the CPO violates the Equal Protection Clause of the Fourteenth Amendment.

300.    Plaintiffs are entitled to declaratory and injunctive relief declaring the CPO unconstitutional as applied to the Property and enjoining the County from enforcing the CPO against Plaintiffs, as well as damages under 42 U.S.C. § 1983.

## COUNT III

### Violation of the Equal Protection Clause of the Fourteenth Amendment
### (Class-of-One) – 42 U.S.C. §1983

301.    Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

302.    The County has intentionally treated Plaintiffs differently from other similarly situated property owners and applicants, with no rational basis for the differential treatment.

303.    The County has approved at least three different properties (Orange Grove, Yard Farm, Penn Center) that are engaging in uses on St. Helena Island that meet the CPO's definition of a "resort" within the CPO. See CDC § 3.4.50(D) (defining "resort" as "lodging that serves as a destination point for visitors and designed with some

combination of recreation uses or natural areas," including "marinas, beaches, pools, tennis, golf, equestrian, restaurants, shops, and the like").

304.   The County approved Orange Grove, Yard Farm, and Penn Center for comparable uses while denying Plaintiffs' development.

305.   At the same time Plaintiffs were pursuing the ZMA and DA, Pulte submitted a rezoning and associated Development Agreement application for the development of Ramsey Farms under the same governing Community Development Code, applicable procedures, and applicable law.

306.   For Ramsey Farms, Staff processed the application as a conventional rezoning request. Staff then applied the review criteria to the actual proposal and recommended approval with negotiation and refinement of the Ramsey Farms Development Agreement.

307.   Plaintiffs did not receive that same process.

308.   The Planning Director deliberately separated Plaintiffs' unified proposal in violation of the CDC's standards and procedures governing review of Development Agreement applications.

309.   Staff repeatedly tried to force the ZMA move forward without the DA, even though the DA only made sense under the future zoning created by the ZMA and the ZMA itself could not be fairly understood without the binding restrictions and public benefits contained in the DA.

310.   While the County Staff recommended approval of Pulte's request by properly considering the applicant's actual rezoning proposal, Plaintiffs' DA application was denied on the basis that the CPO did not permit golf courses.

311.    The County's departure from neutral process set forth in the CDC and applicable state law was intentional and directed at Plaintiffs.

312.    The County lacked any rational basis for treating Plaintiffs differently than a similarly situated applicant (Pulte) under the same CDC, Planning Staff, Planning Director, agenda cycle, and substantially same circumstances.

313.    Councilmember Glover stated that "one of our first priorities was to focus on Pine Island" and described Plaintiffs' development as "a little yeast out there that we need to destroy."

314.    In enforcing the CPO, the County has acted under the color of state law.

315.    The County has deprived Plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment in violation of 42 U.S.C. § 1983.

316.    Therefore, Plaintiffs are entitled to an order declaring that the CPO violates the Equal Protection Clause of the Fourteenth Amendment and enjoining the County from enforcing the CPO against Plaintiffs.

317.    In addition, Plaintiffs are entitled to damages pursuant to 42 U.S.C. § 1983, and an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

### COUNT IV

**Violation of the Due Process Clause of the Fourteenth Amendment
(Void for Vagueness) – 42 U.S.C. §1983**

318.    Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

319.    The Due Process Clause requires that laws provide persons of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited. See Grayned v. City of Rockford, 408 U.S. 104, 108–09 (1972) (stating "we insist that laws

give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.")

320. The CPO is unconstitutionally vague on its face because it fails to provide individuals of ordinary intelligence fair notice of what conduct is prohibited and what uses are permitted.

321. The CPO broadly prohibits any site design that restricts access to: (i) "water;" (ii) "other culturally significant locations;" and (iii) "franchise design." See CDC § 3.4.50(C). These terms are not defined in the CDC, are not tied to measurable criteria, and provide no limiting principles for determining compliance.

322. The CPO overlay zone encompasses nearly the entirety of St. Helena Island.

323. Neither the CDC nor the CPO provides an owner with a reasonable opportunity to understand whether a design feature restricts "access to water" on St. Helena Island, or "other" unidentified culturally significant location, or is an undefined "franchise design."

324. The Ordinance further identifies the harms it seeks to prevent as "large-scale," "rapid," and "suburban" growth, yet provides no objective thresholds, metrics, or standards by which those concepts can be measured or applied. See CDC § 3.4.50(A).

325. Because the ordinance regulates labels rather than measurable impacts, a property owner cannot determine what constitutes prohibited "large-scale" development, what activities qualify as a prohibited "resort" or "restricted access (gated community)," or how to design an otherwise beneficial and lawful project to comply with the ordinance.

326. The CPO prohibits "resorts" and "restricted access (gated communities)" as categories of use while neither term is defined or recognized land use within the CDC's consolidated use table, creating uncertainty as to what specific uses are prohibited. See CDC § 3.4.50(D).

327. The CPO prohibits certain undefined uses while permitting comparable or more intensive uses.

328. The absence of measurable standards allows County officials to interpret terms inconsistently, characterize similar uses differently, and apply shifting frameworks without reference to objective criteria thereby enabling arbitrary and discriminatory enforcement and ad hoc decision-making.

307. These defects arise from the text, structure, and operation of the ordinance itself, and render the CPO unconstitutionally vague.

308. In enforcing the CPO, the County has acted under the color of state law.

309. The County has deprived Plaintiffs of rights secured by the Equal Protection Clause of the Fourteenth Amendment in violation of 42 U.S.C. § 1983.

310. Plaintiffs are entitled to declaratory and injunctive relief invalidating the CPO on vagueness grounds, as well as damages and all other relief available under 42 U.S.C. § 1983.

## COUNT V

**Violation of the Due Process Clause of the Fourteenth Amendment
(Procedural Due Process) – 42 U.S.C. §1983**

311. Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

312. Plaintiffs possess a property interest in the Property.

313. The County has deprived Plaintiffs of protected property interests without due process of law.

314. The County and County officials engaged in a pattern of procedural irregularities directed at Plaintiffs' intended development plan.

315. The County has bypassed procedural requirements under the County's own ordinances to prevent Plaintiffs from proceeding with the intended development plan.

316. The County's adoption of Ordinance 2023/18 violated the mandatory procedure for approving text amendments set forth under S.C. Code § 6-29-760.

317. County Council gave first reading on April 10, 2023, before the Planning Commission reviewed the amendments on May 1, 2023. No text amendment application was filed, and no formal staff report was prepared.

318. The County's failure to comply with the requirements of the CDC and state law resulted in procedural irregularities and caused a lack of transparency which deprived Plaintiffs and the public of the protections afforded by the statutory planning process.

319. On April 7, 2025, Plaintiffs filed the formal ZMA application requesting removal of the Property from the CPO and retention of the base T2R zoning and stated the reason for the request as follows:

> "To downzone 437 developable acres with deed restrictions, to reduce density and impacts, to protect green and open space, and to provide guaranteed community benefits, investment and sustainable economic development on Saint Helena Island through a project consisting of 49 residential units and an 18-hole golf course upon removal from the Cultural Protection Overlay (CPO) and entering a development agreement which allows for the downzoning and benefits to become fully binding and enforceable.

320. On April 17, 2025, Plaintiffs submitted the associated DA application and paid the required fee of $28,110.00 to the County.

321. Section 7.3.10 of the CDC, entitled "Development Agreement Standards," specifically contemplates review under future zone classification when a zoning change is part of the Development Agreement. See CDC § 7.3.10(D).

322. On May 7, 2025, the Planning Director issued the Completeness Letter confirming that the DA application was complete and in active review pursuant to Section 7.4.40(A) of the CDC.

323. Section 7.4.40(A) of the CDC provides as follows:

When an application is determined complete, it shall be distributed by the Director to all appropriate staff and review agencies for review and comment, and the preparation of a staff report. In preparing the staff report the Director or other County staff (as appropriate) shall review the application, relevant support material, and any comments or recommendations from other staff and review agencies to which the application was referred. If deficiencies in complying with applicable standards of this Development Code are identified, the Director shall notify the applicant of such deficiencies and provide the applicant a reasonable opportunity to discuss the deficiencies and revise the application to address them.

See CDC § 7.4.40(A).

324. The County denied Plaintiffs' DA application without notifying "the applicant of such deficiencies and provide the applicant a reasonable opportunity to discuss the deficiencies and revise the application to address them."

325. Staff recommended denial of the DA in a manner that contradicted the County's own procedural requirements and prevented the unified proposal from ever being evaluated as submitted.

326. The County's decision-making process in the ZMA and DA proceeding lacked sufficient procedural safeguards to ensure fair and impartial consideration of Plaintiffs' DA application.

327.    The County has deprived Plaintiffs of protected rights and property interests without due process of law for which Plaintiffs have suffered and continue to suffer injuries.

328.    The County's actions constitute a deprivation of Plaintiffs' procedural due process rights under the Fourteenth Amendment in violation of 42 U.S.C. § 1983.

329.    Therefore, Plaintiffs are entitled to damages pursuant to 42 U.S.C. § 1983, and an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## <u>COUNT VI</u>

### Violation of the Due Process Clause of the Fourteenth Amendment (Substantive Due Process) – 42 U.S.C. §1983

330.    Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

331.    The County adopted and enacted text amendments to Section 3.4.50 of the CDC to include "Use Limitations" prohibiting golf courses, gated communities, and resorts anywhere within the CPO District defined in racially explicit terms.

332.    The County, acting under the color of law, has deprived Plaintiffs of protected property rights by adopting and enforcing an unconstitutional race-based CPO that bears no real and substantial relation to legitimate governmental objectives.

333.    As applied to Plaintiffs, the County's enforcement of the CPO is arbitrary, irrational, and not reasonably related to any legitimate governmental objectives.

334.    The CPO imposes prohibitions on the Property that are not based on any individualized assessment of Plaintiffs' intended development.

335.   The County intentionally manipulated the findings of the federal environmental impact statement to create a false justification for the race-conscious prohibition on lawful land use, which the County ratified through Council approval.

336.   The County's actions, including the arbitrary and irrational decisions to selectively prohibit an otherwise permitted land uses through intentional alteration and manipulation of the NPS Study, cannot be justified by any circumstance or governmental interest.

337.   The County's actions fall so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency.

338.   The County has deprived Plaintiffs of protected rights and property interests without due process of law for which Plaintiffs have suffered and continue to suffer injuries.

339.   The County's actions constitute a deprivation of Plaintiffs' substantive due process rights under the Fourteenth Amendment in violation of 42 U.S.C. § 1983.

340.   Therefore, Plaintiffs are entitled to damages pursuant to 42 U.S.C. § 1983, and an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT VII
### Violation of the Dormant Commerce Clause

341.   Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

342.   The Commerce Clause grants Congress the authority to regulate commerce "with foreign Nations, and among the several States, and with the Indian Tribes." See U.S. Const. art. I, § 8, cl. 3.

343. The County's enactment of the CPO has unduly burdened interstate commerce and has placed St. Helena Island in a position of economic isolation.

344. An ordinance that is applied even-handedly but burdens interstate commerce may still be invalidated for violating the dormant Commerce Clause where the burden on interstate commerce is "clearly excessive in relation to the putative local benefits." See Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

345. In 2024 alone, according to a report published by the State of South Carolina, golf generated $3.6 billion in total economic output, supported 30,404 jobs, and produced $423 million in federal, state, and local tax revenue. Approximately $1.2 billion of that impact came from off-course expenditures by traveling golfers, including lodging, restaurants, retail, and transportation. The travelers are overwhelmingly interstate, with the top out-of-state origin markets including North Carolina, Pennsylvania, Connecticut, Georgia, and New Jersey. By banning golf courses and resorts across the entirety of St. Helena Island, the CPO forecloses participation in that interstate tourism market within the CPO District.

346. In a July 2025 presentation prepared by the Beaufort County Economic Development Corporation ("BCEDC"), the BCEDC stated that: "St. Helena is a rural jurisdiction that due to its physical location has not been the beneficiary of the economic success of the rest of the State of South Carolina, the region, or Beaufort County. As a result, many of its residents have not had any opportunities for financial advancement."

347. By adopting and maintaining the CPO's categorical prohibition on golf courses and resorts, the County has impermissibly imposed burdens upon the flow of goods, materials, and other articles of commerce across state lines.

348. The County's CPO violates the dormant Commerce Clause by unjustifiably imposing a burden on interstate commerce that is clearly excessive in relation to any putative local benefits.

349. Plaintiffs have suffered and continue to suffer injuries as a direct and proximate result of the County's enactment and application of the CPO.

350. Therefore, Plaintiffs are entitled to declaratory and injunctive relief declaring the CPO unconstitutional and enjoining the County from enforcing the CPO, as well as damages under 42 U.S.C. § 1983.

351. Plaintiffs are entitled to attorney's fees under 42 U.S.C. § 1988 as prevailing parties in this civil rights action.

## <u>COUNT VIII</u>

### Declaratory and Injunctive Relief – 28 U.S.C. §§ 2201 – 2202

352. Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

353. Plaintiffs seek declaratory and injunctive relief for the County's ongoing violations of Plaintiffs' rights under the United States Constitution, including the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

354. This Court has authority to grant the declaratory relief requested herein pursuant to 28 U.S.C. § 2201 and to grant Plaintiffs further necessary or proper relief pursuant to 28 U.S.C. § 2202.

355. An actual and justiciable controversy exists between the parties relating to the constitutionality of the CPO, both on its face and as applied to Plaintiffs and the Property.

356. Plaintiffs own Property that is burdened by the CPO.

357.    Plaintiffs have sought, and continue to seek, to develop the Property in manner that is "permitted by right" for the T2R zoning classification but prohibited by the CPO.

358.    The County has enforced, and continues to enforce, the CPO against Plaintiffs, and there exists a credible threat of continued enforcement that will cause ongoing and irreparable harm to Plaintiffs.

359.    The CPO is unconstitutional on its face because its text, purpose, and operation violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

360.    The race-conscious purpose and design of the CPO has been established by: (a) the text of the Ordinance, which explicitly identifies the Gullah/Geechee people by race and ancestry; (b) the Ordinance's purpose statement, which ties land use restrictions to the preservation of a specific racial group; (c) the statements and admissions of County officials confirming that the CPO was created as a race-conscious instrument; and (d) additional factors, including, but not limited to, the County's failure to consider race-neutral, less restrictive alternatives.

361.    On its face, the CPO endorses race-based reasoning and the concept of a government that divides people by racial classifications.

362.    The CPO is invalid in all applications and "no set of circumstances exists under which the [CPO] would be valid." See United States v. Salerno, 481 U.S. 739, 745 (1987).

363.    As applied to Plaintiffs, the CPO categorically prohibits uses including, but not limited to, golf courses, resorts, and gated communities, that are permitted for similarly

situated properties zoned T2R within Beaufort County that are not subject to the CPO in a disparate manner.

364. As applied to Plaintiffs, the CPO is not rationally related to a legitimate governmental interest.

365. The County has intentionally treated Plaintiffs differently from other similarly situated property owners and applicants, with no rational basis for the differential treatment.

366. The County has approved at least three different properties (Orange Grove, Yard Farm, Penn Center) that are engaging in uses on St. Helena Island that meet the CPO's definition of a "resort" within the CPO while targeting and denying Plaintiffs' comparable development. See CDC § 3.4.50(D) (defining "resort" as "lodging that serves as a destination point for visitors and designed with some combination of recreation uses or natural areas," including "marinas, beaches, pools, tennis, golf, equestrian, restaurants, shops, and the like").

367. The County treated Plaintiffs differently than a similarly situated applicant (Pulte) under the same CDC, Planning Staff, Planning Director, agenda cycle, and substantially same circumstances.

368. For Ramsey Farms, Staff processed the application as a conventional rezoning request, applied the review criteria to the actual proposal and recommended approval.

369. For Plaintiffs' ZMA and DA application, Staff evaluated the DA under existing CPO constraints rather than the future zoning framework requested through the ZMA without notifying "the applicant of such deficiencies and provide the applicant a

reasonable opportunity to discuss the deficiencies and revise the application to address them" and recommended denial of the DA. See CDC § 7.4.40(A).

370.    Plaintiffs have no adequate remedy at law to prevent the continuing and future enforcement of the unconstitutional CPO.

371.    Plaintiffs are entitled to a declaration that the CPO is unconstitutional on its face and as applied to Plaintiffs, violates Equal Protection and Due Process Clauses of the Fourteenth Amendment, and is void for vagueness.

372.    Plaintiffs further seek a permanent injunction prohibiting enforcement of the CPO's unconstitutional provisions.

373.    Plaintiffs are entitled to attorney's fees under 42 U.S.C. § 1988 as prevailing parties in this civil rights action.

## COUNT IX
### Declaratory and Injunctive Relief – 28 U.S.C. §§ 2201 – 2202

374.    Plaintiffs restate and reallege each and every paragraph above as if fully stated herein.

375.    Plaintiffs seek declaratory and injunctive relief declaring the CPO invalid under the South Carolina Local Government Comprehensive Planning Enabling Act of 1994 (the "Enabling Act"), §§ 6-29-310, et seq., and declaring the County's continued enforcement of the CPO an unauthorized exercise of zoning authority.

376.    This Court has supplemental jurisdiction over this state-law claim pursuant to 28 U.S.C. § 1367(a) because it arises out of a common nucleus of operative fact with the federal constitutional claims and is so related that it forms part of the same case or controversy.

377. Section 6-29-720 of the Enabling Act, entitled "Zoning districts; matters regulated; uniformity; zoning techniques," authorizes the governing body to adopt a zoning ordinance creating zoning districts and to regulate matters within each zoning district. See S.C. Code § 6-29-720.

378. The "regulations **must be uniform** for each […] use throughout each district." See S.C. Code § 6-29-720(B) (providing that "all of these regulations must be uniform for each class or kind of building, structure, or use throughout each district") (emphasis added).

379. The CPO violates the uniformity requirement under S.C. Code § 6-29-720 by prohibiting "Recreational Facility: Golf Course" within the T2R zoning district on St. Helena Island while the identical use is permitted by right, without conditions and without special exception, in the Rural (T2R) Zone throughout the remainder of Beaufort County.

380. In addition, the CPO exceeds the permissible scope of overlay zones under Section 6-29-720, which limits overlay districts to those that impose a set of requirements or relax a set of requirements imposed by the underlying zoning district when a "special public interest" exists. See S.C. Code § 6-29-720(C)(5).

381. St. Helena Island is the only geographic area in Beaufort County in which golf courses are prohibited in the Rural (T2R) Zone.

382. Plaintiffs are entitled to a declaration that: (i) the CPO invalid on the basis that Ordinance 2023/18 violates the uniformity requirement under S.C. Code § 6-29-720 by prohibiting "Recreational Facility: Golf Course" within the T2R zoning district on St. Helena Island while the identical use is permitted by right, without conditions and without special exception, in the Rural (T2R) Zone throughout the remainder of Beaufort County;

and (ii) the CPO impermissibly prohibits uses that are "permitted by right" in the underlying zoning district, which neither imposes a set of "requirements" nor relaxes requirements imposed by the underlying T2R zoning.

383.   Plaintiffs have no adequate remedy at law to prevent the continuing and future enforcement of the unconstitutional CPO.

384.   Plaintiffs further seek a permanent injunction prohibiting enforcement of the CPO's unconstitutional provisions.

**WHEREFORE,** on the basis of these claims against Defendant Beaufort County, South Carolina, Plaintiffs Pine Island Property Holdings, LLC and Pine Island GC, LLC respectfully request that this Court enter judgment in their favor and grant the following relief:

i.   A declaration that Ordinance No. 2023/18, codified at CDC § 3.4.50, is unconstitutional on its face and as applied to Plaintiffs in violation of the Fourteenth Amendment to the United States Constitution;

ii.   Issue injunctive relief permanently enjoining the County and County Officials from enforcing the CPO against Plaintiffs and the Property;

iii.   An award of damages pursuant to 42 U.S.C. § 1983 to redress the ongoing injuries by the County, under color of state law, and deprivation of rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, in an amount to be proven at trial;

iv.   A declaration that the CPO is invalid under South Carolina law, including S.C. Code § 6-29-720, and unenforceable as applied to Plaintiffs' Property;

v.   An award of reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

vi.   An award of pre-judgment and post-judgment interest; and

vii.   Award Plaintiffs such other and further legal and equitable relief as this Court deems just, proper, and necessary to remedy the ongoing constitutional violations and prevent future harm.

Respectfully submitted,

By:  *s/ Ellis R. Lesemann*
  Ellis R. Lesemann (Fed. ID No. 7168)
  erl@lalawsc.com
  Michelle A. Stewart (Fed. ID No. 12460)
  mas@lalawsc.com
  Lesemann & Associates LLC
  418 King Street, Suite 301
  Charleston, SC 29403
  (843) 724-5155

April 17, 2026      ***Attorneys for Plaintiffs***
Charleston, South Carolina